**Lino AVILES, Plaintiff,**

v.

**Otis BOWEN, Secretary of Health and Human Services, Defendant.**

**No. 88 Civ. 7627 (RWS).**

United States District Court,
S.D. New York.

May 24, 1989.

Cardozo Bet Tzedek Legal Services by Toby Golick, of counsel, Laura Davis, Legal Intern, New York City, for plaintiff.

Benito Romano, U.S. Atty., S.D.N.Y. by Linda A. Riffkin, Sp. Asst. U.S. Atty., of counsel, New York City, for defendant.

## OPINION

SWEET, District Judge.

Plaintiff Lino Aviles ("Lino"), a ten year old boy, has moved by his mother and next friend, Elida Gonzalez, pursuant to 42 U.S. C. § 1383(c)(3) and 42 U.S.C. § 405(g) for an order reversing the decision of defendant Secretary of the Department of Health and Human Services (the "Secretary") denying Lino's application for Supplemental Security Income disability benefits ("SSI"). Because recent medical and psychiatric evidence bears on Lino's condition, Lino has moved alternatively for a remand coupled with an award of interim benefits. Although the Secretary concedes that the additional evidence supports a remand, he nonetheless has moved pursuant to Rule 12(c), Fed.R.Civ.P., for an order affirming the denial of benefits and dismissing the complaint. For the reasons set forth below, Lino's motion is granted, and the Secretary's motion is denied.

The Facts

This case involves a young boy's determined effort to obtain disability benefits to help him cope with his juvenile diabetes mellitus and related emotional disorders. Lino was diagnosed with diabetes when he was seven and a half years old. Since then, he has suffered numerous bouts of acidosis and hypoglycemia and endured a barrage of related emotional problems. Lino's combined afflictions sent him to the hospital three times, culminating in a continuous sixteen-month period of hospitalization that included a four-month stay in a psychiatric unit. Despite Lino's repeated hospitalization, the Social Security Administration denied his application for disability benefits, and an Administrative Law Judge ("ALJ") upheld the denial following a thirty-minute hearing held just two weeks after Lino's release from the hospital. Less than seven weeks after the hearing, Lino again lost control of his diabetes, and—between the hearing and the time this case was fully submitted—Lino had been hospitalized no less than seven more times. The issue here is whether the Secretary's denial of benefits to Lino was supported by substantial evidence.

### Facts Available Prior to the Administrative Hearing

Lino was born on June 9, 1978. He currently lives with his mother, Elida Gonzalez, and her four other children in the Bronx. Mrs. Gonzalez supports herself and her five children on public assistance amounting to a meager $600 a month.

Lino's mother is working towards a degree at the College of New Rochelle and hopes eventually to get a job to support her family. She has participated actively in Lino's treatment, and Dr. D. Katz, a psychiatrist treating Lino, notes that Lino's mother "is a very reliable and responsive parent regarding [Lino's] treatment course." Lino receives no support from his

father, and Mrs. Gonzalez reports that Lino's father's whereabouts are unknown.

Lino enjoyed good health until December 1985 when he developed conditions causing incontinence, excessive urine excretion, and progressive weight loss. In January 1986, Lino entered Lincoln Hospital ("Lincoln") with diabetic ketoacidosis and was diagnosed with juvenile diabetes mellitus. Lino remained in the hospital for three weeks until his condition stabilized.

Less than four months later, on April 3, 1986, Lino entered Columbia Presbyterian Hospital ("Columbia Presbyterian") for three days after his poorly controlled diabetes provoked hypoglycemia (abnormally low blood sugar) that caused him to pass out.

In July 1986, Lino attended a camp for diabetic children. Upon his return, Lino learned that his step-father, with whom he was very close, had been incarcerated, and he again lost control of his diabetes. Initially, Lino was treated on an out-patient basis, but when that proved insufficient, he entered Babies Hospital (part of Columbia Presbyterian) on November 21, 1986 for what was to become a continuous sixteen-month period of hospitalization.

Lino later was transferred from Babies Hospital to Blythedale Hospital ("Blythedale") where he remained until he was transferred to Mt. Sinai Hospital's Child Psychiatry Unit ("Mt. Sinai"). On August 17, 1987, Lino again was transferred, this time to St. Mary's Hospital ("St. Mary's"). Continued hospitalization was necessary to monitor closely Lino's diet and insulin program, the essential features for controlling his diabetes. Despite careful monitoring at St. Mary's, however, Lino suffered three bouts of hypoglycemia before his discharge in March 1988.

Lino requires special foods to help control his diabetes, but his mother cannot afford them on the public assistance she currently receives.

As a result of his diabetes, Lino suffers from numerous emotional problems. In early 1986, Lino began responding to his hypoglycemia attacks and their attendant blackouts by hiding in closets and under beds. While at Blythedale, hospital psychiatrists diagnosed Lino as having an attentional deficit disorder without hyperactivity and an adjustment disorder with disturbance of mood and behavior. The doctors treated him with Ritalin, a drug used to deal with short attention span, distractibility, and impulsivity.

At Mt. Sinai, Lino received psychiatric evaluation in a closed setting with twenty-four hour observation. Finding that Ritalin had produced no significant improvement in Lino's condition, Mt. Sinai doctors stopped providing him this drug. Mt. Sinai doctors found that Lino exhibited diabetes-related oppositional behavior, including refusal to eat and taking longer than necessary to take his blood sugar.

Lino also received psychiatric treatment while at St. Mary's. A neurological exam indicated that his overall abilities were within normal limits, but it found some minor perceptual and gross motor difficulties.

On July 6, 1987, while Lino was in the hospital, Mrs. Gonzalez applied for SSI under the children's disability program, stating that Lino suffered from juvenile diabetes mellitus and a psychiatric disorder. The Secretary denied her application, noting that Lino's condition—although severe—had stabilized in the hospital. Lino applied for reconsideration, but the Secretary denied that application, reasoning that Lino could function "normally" and perform "age-appropriate" activities.

Lino's mother requested a hearing, and—just two weeks after Lino had been released from a sixteen-month hospital stay—the ALJ held a 30–minute hearing on April 1, 1988. A paralegal from the Bronx Legal Services represented Lino at the hearing. Also present was Dr. Luis Canepa, a psychiatrist and neurologist who served as medical advisor to the ALJ. Dr. Canepa reviewed the medical evidence and questioned Lino's mother, but he never examined Lino.

Following the hearing, the ALJ issued a ruling on May 23, 1988 affirming the denial

of benefits. The key paragraphs in the ALJ's decision provide:

> Dr. Luis Canepa ... testified that the claimant is not suffer[ing] from a severe impairment which meets or equals the requirements of the Listing of Impairments for children under Sections 109.08 or 112.00, describing juvenile diabetes mellitus, mental and emotional disorders as the claimant's conditions are relatively mild. Although the child may reportedly have some problems, his diabetic condition does [not] interfere significantly with his growth and development.[1] He is presently attending regular classes in school and is doing scholastically well. There is no evidence of growth retardation or impaired renal function. There are no visual or cardiac abnormalities. A psychological evaluation done in 1987 found the claimant to be functioning at an average level of intelligence. The claimant is reportedly anxious and has become more anguish[ed] since the development of diabetes but seems to be presently coping and adjusting well to his condition. In addition, the medical advisor was of the opinion that the claimant's impairments are not such that if found in an adult would be preclusive of substantial gainful work activity.
>
> I have made a complete review on my own of the available medical evidence and testimony and adopt the medical advisor's conclusion.

Upon receiving the ALJ's ruling, Lino appealed to the Appeals Counsel, which denied review. Lino then filed this lawsuit.

### New Evidence

Since the ALJ completed the hearing, new evidence has emerged regarding Lino's diabetes and emotional health. Medical records reveal that Lino has been hospitalized seven times since the hearing, with the first incident occurring on May 21, 1988, less than seven weeks after the hearing on his application for benefits. These hospitalizations ranged in duration from two days to nine days, and all of them resulted from Lino's poorly controlled diabetes.

In addition, Dr. Katz of the South Bronx Mental Health Council has submitted a psychiatric report dated January 12, 1989 in which he stated that Lino's diabetes and repeated hospitalizations "increase [his] level of anxiety, restlessness and depression enuresis which affect his behavior and school performance." Dr. Katz also noted Lino's poor attention span and concentration, poor judgment and insight, poor memory, and severe impairment in relating to others and performing daily activities. He concluded that Lino meets the listing of functional nonpsychotic disorder with anxiety, depression, and oppositional behavior, and he offered a poor prognosis.

### Discussion

Under the Social Security Act, the Secretary's decision is binding on this court if it is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Havas v. Bowen,* 804 F.2d 783, 785 (2d Cir.1986). Substantial evidence means "more than a mere scintilla. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401, 91 S.Ct. at 1427 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

20 C.F.R. 416.924 requires a finding of disability if a child has a physical or mental impairment lasting at least twelve months that either is listed in Appendix 1 of Subpart B of Part 404 or is determined to be medically equal to an impairment listed in that appendix. One of the listed impairments includes:

> Juvenile diabetes mellitus ... requiring parenteral [injected] insulin. And one of the following, despite prescribed therapy:

---

1. The ALJ's decision says: "his diabetic condition does interfere significantly with his growth and development." However, from the introductory clause in the sentence beginning with "although" and from the paragraph's content, it seems clear that the ALJ inadvertently admitted "not" from his decision.

A. Recent, recurrent hospitalizations with acidosis; or

B. Recent, recurrent episodes of hypoglycemia; or

C. Growth retardation ...; or

D. Impaired renal function....

Listing 109.08. Another of the listed impairments includes functional nonpsychotic disorders:

[d]ocumented by psychiatric evaluation and supported, if necessary by the results of appropriate standardized psychological tests manifested by marked restriction in the performance of daily age-appropriate activities; constriction of age-appropriate interests; deficiency of age-appropriate self-care skills, and impaired ability to relate to others; together with persistence of one (or more) of the following:

\* \* \* \* \* \*

B. Anxiety; or

C. Depression;

\* \* \* \* \* \*

Listing 112.04. A finding that Lino suffered either of these impairments would qualify him for disability benefits.

### 1. Diabetes

■ The ALJ ruled that Lino's diabetes did not constitute a listed impairment or an impairment medically equal to a listed impairment. However, this ruling is not supported by substantial evidence.

#### a. Dr. Canepa's Testimony

According to the ALJ, "Dr. Luis Canepa ... testified that the claimant is not suffer[ing] from a severe impairment which meets or equals the requirements of the Listing of Impairments for children under Sections 109.08 or 112.00, describing juvenile diabetes mellitus, mental and emotional disorders as the claimant's conditions are relatively mild." The ALJ later said he "adopt[s] the medical advisor's conclusion."

■ There are several problems with the ALJ's reliance on Dr. Canepa's testimony for finding that Lino's diabetes did not constitute a listed impairment. First, Dr. Canepa in fact offered no conclusion re-

garding whether Lino's diabetes met or equaled a listed impairment. Even if he had, however, that would not support the ALJ's decision. Dr. Canepa is board certified as a psychiatrist and neurologist, not as an endocrinologist qualified to offer an opinion regarding Lino's diabetes. Moreover, Dr. Canepa served only as medical advisor at the hearing—he reviewed the medical record and questioned Lino's mother at the hearing, but he never examined Lino. As a nonexamining physician, Dr. Canepa's role was to explain medical tests, procedures, and language to the ALJ. *See Martin v. Secretary of Dep't of HEW*, 492 F.2d 905, 909 (4th Cir.1974). Beyond that, "[t]he reports of a nonexamining physician deserve little, if any, weight in the overall evaluation of disability." *Burnette v. Bowen*, 702 F.Supp. 47, 50 (E.D.N.Y.1988).

#### b. Diabetes as a Listed Impairment

As quoted above, juvenile diabetes mellitus constitutes a listed impairment if it requires insulin injections and the claimant documents any one of the following: recent recurrent hospitalization with acidosis, recent recurrent episodes of hypoglycemia, growth retardation, or impaired renal function. In applying this standard, the ALJ stated: "There is no evidence of growth retardation or impaired renal function. There are no visual or cardiac abnormalities." Nowhere in his opinion, however, did the ALJ discuss whether Lino's recurrent hospitalization and hypoglycemia establish his diabetes as a listed impairment.

In fact, the record contains ample evidence that Lino has required hospitalization for acidosis and that he has suffered recurrent episodes of hypoglycemia. Lino's inability to control his diabetes had resulted in almost seventeen months of hospitalization prior to the hearing. Even while he was hospitalized, Lino continued to experience hypoglycemia. Despite careful supervision of his diet and insulin treatments at St. Mary's, for example, Lino suffered no less than three documented episodes of hypoglycemia. He also experienced hypoglycemia while at Mt. Sinai.

In his brief, the Secretary points to hospital records indicating that Lino suffered "occasional" hypoglycemia, but then asserts that this does not demonstrate "the *recurrent* episodes referred to in the [listings]." Secretary Mem. at 16. There is no reason to believe that "occasional" hypoglycemia does not constitute "recurrent" hypoglycemia, particularly when the episodes occur despite careful and continuous supervision in a hospital.

Although they can have no bearing on a reversal of the Secretary's decision, events since the hearing confirm that Lino's diabetes constitutes a listed impairment. As detailed above, Lino has been hospitalized seven times since the hearing for poorly controlled diabetes.

### c. The Severity of Lino's Diabetes

The ALJ observed that Lino's diabetes was "relatively mild," apparently relying upon Dr. Canepa's testimony. The difficulties inherent in Dr. Canepa's conclusions—to the extent he offered them—are outlined above. Beyond that, however, a finding that Lino's diabetes was "relatively mild" just two weeks after he had concluded sixteen months of continuous hospitalization hardly constitutes substantial evidence for denying him disability benefits.

### d. Lino's Adjustment

The ALJ stated: "Although the child may reportedly have some problems, his diabetic condition does [not] interfere significantly with his growth or development. He is presently attending regular classes in school and doing scholastically well." The implication of this finding is that Lino had adjusted to his diabetes and could function normally. There is not substantial evidence in the record to support this conclusion.

The Secretary emphasizes repeatedly in his brief that Lino required sixteen months of hospitalization to "educate [him] about his diabetes and how to control that condition," Secretary Mem. at 4, to obtain "a degree of supervision to ensure that his diet was followed and that his medications were given correctly," Secretary Mem. at 5,

and for "close supervision of his diet and insulin administration," Secretary Mem. at 6. Yet, based upon a hearing conducted just two weeks after Lino left the hospital, the ALJ—with optimism recent events have proved completely unwarranted—concluded that Lino's condition had stabilized and that Lino was capable of leading a normal life. All the evidence he relied upon for this conclusion, however, emerged from Lino's experience in the *hospital*—the ALJ had no evidence to indicate that Lino could sustain this outside a tightly-controlled hospital regimen.

### 2. Emotional Disorders

■ The ALJ's ruling that Lino's emotional disorders did not amount to a listed impairment also is not supported by substantial evidence.

The ALJ relied primarily upon Dr. Canepa's testimony in concluding that Lino's emotional disorders do not amount to a listed impairment. During the hearing, the following exchange took place between the ALJ and Dr. Canepa:

ALJ: Does he meet or equal any listing in the psychiatric condition?

[Dr. Canepa]: No. He does not....

In his ruling, the ALJ stated: "[T]he medical advisor was of the opinion that the claimant's impairments are not such that if found in an adult would be preclusive of substantial gainful work."

However, Dr. Canepa's testimony does not constitute substantial evidence. As noted above, Dr. Canepa did not examine Lino, so his opinion is accorded little, if any, weight. Moreover, a careful reading of Dr. Canepa's testimony reveals that his opinion was far from unequivocal. For example, when questioned at the hearing about a treating hospital's report that Lino's prognosis is guarded and that relapses of depression, mood disorder, and self-destructive behavior may occur, Dr. Canepa responded:

There—they are probably, you know, in a better position, the treating source of problems than me to say that. There are many favorable things in the case, like the mother is very committed, very

helpful, the kid is intelligent, and I ... think he could live you know, a normal life. That doesn't mean that he couldn't have a relapse[ ], especially thing[s] at home that are beyond the mother's control. You know ... I'm sure he's very vulnerable, but—but I think the future is not necessarily bleak. And they have received help from many good people and they are able to accept it. But it's—you know, it's difficult. I think it takes time for kids to accept.

But you know, it would be a good idea to perhaps get more detail on those from [the treating hospital], and what they mean.

In addition, the ALJ appears to have relied substantially upon evidence relating to Lino's intelligence. The opinion notes that Lino "is presently attending regular classes in school and doing scholastically well," and that "[a] psychological evaluation done in 1987 found [Lino] to be functioning at an average level of intelligence." The ALJ also may have been influenced by Dr. Canepa, whose testimony referred to Lino's intelligence. Responding to the ALJ's question as to whether Lino meets or equals any listing for his psychiatric conditions, Dr. Canepa said: "No. He does not. There is an IQ—there was a test done but I don't remember which hospital, and he's—he's a bright kid. He scored in the average, a full scale IQ of 100." Responding to a question about the possibility of relapses of his emotional problems, Dr. Canepa listed as one of the "favorable things in the case" the fact that Lino "is intelligent."

However, the record reveals that Lino has an extensive history of emotional problems despite, or perhaps because of, his acknowledged intelligence and satisfactory school performance. According to medical records, Lino has difficulty adhering to his medical self-care requirements, he has problems with involuntary bowel movements, he has difficulty maintaining peer relationships, and he suffers from depression and anxiety. From 1984 through at least 1987, Lino exhibited a tendency to withdraw and hide in closets or under beds. His psychiatrists have noted hyperactivity, daydreaming, impulsivity, lack of concentration, and distractibility, and they have diagnosed Lino as suffering an adjustment disorder with disturbances of mood and behavior, an oppositional disorder, an attention deficit disorder, and a dysthymic disorder.

In his opinion, the ALJ noted: "The claimant is reportedly anxious and has become more anguish[ed] since the development of diabetes but seems to be presently coping and adjusting well to his condition." Yet, until just two weeks prior to the hearing, Lino had been in the hospital continuously for sixteen months, including four months in a psychiatric unit.

At the hearing, Lino's mother testified that in the two weeks Lino had spent at home:

—Lino's teacher had called twice because of his behavioral problems, including his getting "very upset and angry," as well as "sleepy and tired in class."

—Lino got along with other people, "except when he gets angry," which occurs "[a]lmost every day."

—"He's always hitting his brothers and sisters, and I have to keep him in the living room, keep him away from his sisters and brothers."

—"He does it on his pants."

—"He hides his underwear...."

—"Most of the time he's like dazed. You talk to him and he says what? He don't know what you're talking about. He don't pay attention that much."

Under questioning from the ALJ, Lino testified that:

—He gets into problems in school "[a]most every day."

—He "go[es] to the bathroom on [himself]."

—He "get[s] mad at [his] sisters and brothers."

Even Dr. Canepa described facts demonstrating Lino's continuing emotional problems:

—"In the book he has soiled his pants twice in a period of maybe 2 or 3 weeks."

—"Certainly the [incontinence], it's a problem that you know, can create social problems, that he feels out of control and kids can tease him about and it could make the adjustment more difficult. That certainly is a problem."

Evidence available since the hearing—although it can have no bearing on the reversal—confirms that the ALJ lacked substantial evidence for concluding that Lino's emotional problems did not constitute a listed impairment. A report prepared by Dr. Katz, a psychiatrist treating Lino, states:

—"Due to Lino's illness, he has multiple hospitalizations, increase[d] level of anxiety, restlessness and depression enuresis which affect his behavior and school performance."

—"He presents poor attention span and concentration. His mood fluctuates from session to session from anger to restlessness. His judgment and insight are poor. No thinking or perceptive disturbances were elicited, but [he] becomes oppositional."

—"He becomes very moody with aggressive sadness, withdrawal and anxiety at different points in time."

Most importantly, Dr. Katz concluded: "Lino Aviles meets the listing (112.04) of Functional Nonpsychotic Disorder with Anxiety, depression and oppositional behavior."

Conclusion

The lack of substantial evidence to support the ALJ's decision here brings to mind the observations of the Honorable Eugene Nickerson in *Burnette v. Bowen*, 702 F.Supp. 47, 48 (E.D.N.Y.1988):

As will appear, there is no substantial evidence to support the Secretary's conclusion. Sadly, this decision does not represent an isolated aberration by the Secretary. For some time this court has been concerned about the apparent unfairness of the Secretary in assessing claims for disability. [The claimant's] case is only one of what the court regards as a long series of shocking injustices perpetrated by the Secretary on applicants for benefits. Case after case

appearing before the court reveals a determined predisposition on the part of the Secretary and his agents to decide that claimants are not disabled without any substantial evidence to support the decisions.

.... It is clear that for the last several years many claimants have not been treated fairly or objectively. The instances are so numerous as to call into question the intellectual integrity of the administration of the entire program.

For the reasons set forth above, Lino's motion is granted and the Secretary's motion is denied. The Secretary's denial of benefits is reversed, and the case is remanded for calculation of benefits.

It is so ordered.