Milagros MORALES o/b/o Angelica
MORALES, Plaintiff,

v.

Jo Anne BARNHART, Commissioner
of Social Security, Defendant.

No. 00 CIV. 9675(DC).

United States District Court,
S.D. New York.

Aug. 21, 2002.

James M. Baker, Bronx Legal Services, Bronx, NY, Christopher James Bowes, Center for Disability Advocacy Rights ("CeDAR"), Inc., New York City, for Plaintiff.

James B. Comey, United States Attorney for the Southern District of New York, By John E. Gura, Assistant United States Attorney, New York City, for Defendant.

## *OPINION*

CHIN, District Judge.

In April of 1993, when plaintiff Angelica Morales was five years old, she was hospitalized with symptoms of juvenile diabetes. Angelica was diagnosed with insulin dependent diabetes mellitus, and required regular insulin injections to avoid serious medical complications. In July of 1993, Angelica, by her mother Milagros Morales, filed an application with the Social Security Administration for childhood supplemental security income ("SSI") benefits. Her application was denied, initially and upon reconsideration. That decision was later vacated, however, and Angelica's case was remanded for additional administrative proceedings. Another hearing was held, and on March 27, 1998, Morales's application was again denied.

Morales brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), challenging the final determination of the Commissioner of Social Security (the

"Commissioner")[1] that she was not "disabled" and therefore not entitled to SSI benefits. The parties cross-move for judgment on the pleadings pursuant to Fed. R.Civ.P. 12(c).

As the record shows, the Commissioner's decision that Angelica was not "disabled" is not supported by substantial evidence and is the result of legal error: the ALJ and the Appeals Council failed to consider whether Angelica's impairment, which they acknowledged to be "severe," met or was medically equal to an impairment listed in the applicable regulations. Indeed, neither the ALJ nor the Appeals Council even discussed the listing for "juvenile diabetes mellitus." The record shows, however, that Angelica has a listed impairment. Moreover, Angelica is now approaching her fifteenth birthday and her application for SSI benefits has been pending for more than nine years. Under the circumstances, and for the reasons set forth below, the Commissioner's motion is denied; Morales's cross-motion for judgment on the pleadings is granted; and the case is remanded solely for the calculation of benefits.

## BACKGROUND

### A. Procedural History

Morales filed an application on behalf of her daughter Angelica for childhood SSI benefits on July 1, 1993, citing diabetes as the source of her daughter's impairment. (Tr. 16, 51).[2] The application was denied initially and upon reconsideration. (Tr. 91, 93). Morales requested a hearing, and on February 3, 1995, she and her daughter appeared before Administrative Law Judge ("ALJ") John D. Thompson, Jr. ALJ Thompson considered the claim de novo, and on December 4, 1995, issued

a decision finding that Angelica was not disabled. (Tr. 296–305). Morales then requested review of ALJ Thompson's decision, attaching new evidence to her request. (Tr. 306–11). On June 19, 1996, the Appeals Council granted Morales's request, vacated ALJ Thompson's decision, and remanded the case for additional administrative proceedings. (Tr. 312–14).

On July 7, 1997, Morales and Angelica appeared pro se before ALJ Robin J. Artz. (Tr. 43–51). Morales was granted an adjournment to obtain legal representation, and on September 9, 1997, Morales and Angelica, accompanied by counsel, appeared for a hearing. (Tr. 46–47, 50, 52–87). ALJ Artz considered the case de novo, and by decision dated March 27, 1998, found Angelica not disabled. (Tr. 31–42). Morales again requested review of the ALJ's decision, also requesting an extension to submit a memorandum in support of her claim. (Tr. 27). The request was granted, and Morales submitted a memorandum and new evidence on October 5, 2000. (Tr. 5–23, 382–405). The Appeals Council denied Morales's request for review on November 3, 2000, and ALJ Artz's decision denying benefits thus became the final decision of the Commissioner. (Tr. 5–6).

Morales filed a complaint in this Court on December 27, 2000, seeking judicial review of the Commissioner's final decision. The Commissioner filed its answer on July 3, 2001. On October 19, 2001, Morales moved for judgment on the pleadings, for an order reversing the final decision of the Commissioner and remanding the case solely for the calculation of benefits, or, in the alternative, remanding the case for a new hearing and decision. The Commis-

---

1. Jo Anne Barnhart became the Commissioner of Social Security on November 9, 2001. Pursuant to Fed.R.Civ.P. 25(d)(1), she is hereby substituted as the defendant in this suit.

2. "Tr. ___" refers to the numbered pages of the Administrative Record filed with the Commissioner's answer.

sioner filed its cross-motion for judgment on the pleadings on December 17, 2001, for an order affirming the Commissioner's decision and dismissing the complaint.

## B. *Facts*

### 1. *Medical Evidence*

### (a) *Insulin Dependent Diabetes Mellitus ("IDDM")*

Angelica was born on September 16, 1987. (Tr. 65). On April 22, 1993, at five years of age, Angelica was admitted to the emergency room at New York Hospital with symptoms of diabetic ketoacidosis ("DKA").[3] According to the notes of her admission, Angelica's symptoms included vomiting, lethargy, polydipsia, polyuria, acidosis, ketosis, and hyperglycemia.[4] (Tr. 179). Angelica's mother also reported that Angelica had increased thirst and decreased appetite, a fever for four days, and had been going to the bathroom more frequently at night. (*Id.*). Angelica had never been hospitalized before, and testing revealed an extremely elevated glucose level. Angelica was diagnosed with new onset insulin dependent diabetes mellitus ("IDDM") with DKA. (Tr. 181, 182, 184, 187, 242). She was treated in the intensive care unit with insulin and other medications, and placed on an American Diabetic Association ("ADA") diet. (Tr. 185, 188–89, 204, 218–30). Angelica was discharged after thirteen days with instructions for her mother to give her insulin injections twice daily, check her blood sugar levels at intervals during the day, and check her urine for ketones if her blood sugar exceeded 240 ml/dL. (Tr. 241–43).

On August 19, 1993, Dr. Vargas, a physician at New York Hospital's Endocrinology Clinic, submitted a summary of her treatment of Angelica. (Tr. 118–22). Dr. Vargas had first examined Angelica on April 22, 1993, noting that she presented with diabetic ketoacidosis, polydipsia, and polyuria, and polyphagia (excessive eating) despite weight loss. Dr. Vargas instructed Angelica to follow the ADA diet and eat three meals and three snacks per day at structured times to avoid episodes of hyper- and hypoglycemia. She also commented, however, that "diabetes is difficult to control in children [and] we see fluctuations in blood sugars frequently." Dr. Vargas reported that Angelica was having trouble accepting her diabetes, and cried when she received injections and fingersticks. (Tr. 118–125).

Angelica also received treatment from Dr. L. Rondon from September of 1993 to January of 1995. (Tr. 131, 250, 252–258). On her initial visit, Angelica was reportedly active and feeling well, and her blood glucose level was 205 mg/dL. (Tr. 131, 135, 267). At 10:30 a.m., her glucose level was 314 mg/dL and at 1:30 p.m., it was 139 mg/dL. (Tr. 133–34). An endocrinologist recommended adjusting Angelica's insulin levels. (Tr. 134). Dr. Rondon also noted that Angelica had not been listening to her mother for the past two months. (Tr. 131). In September of 1993, Angelica was taken to the emergency room after her mother detected ketones in her urine for two days. (Pl. Mem. Supp. J. at 10 (citing Tr. 286–87)).

Angelica was also treated by Dr. Mary Horlick, a pediatric endocrinologist at St.

---

3. DKA is a feature of uncontrolled diabetes mellitus characterized by a combination of ketosis and acidosis. Ketosis is the accumulation of substances called ketone bodies in the blood. Acidosis is increased acidity of the blood. Dorland's Illustrated Medical Dictionary ("Dorland's") 942 (29th ed.2000).

4. Polydipsia is defined as chronic excessive thirst; polyuria is excessive urination; nocturia is excessive urination at night; hyperglycemia is abnormally increased blood glucose; and hypoglycemia is abnormally decreased blood glucose. Dorland's at 1430, 1436, 1222, 851, 863.

Luke's/Roosevelt West Side Pediatric Association, who provided a summary of her treatment on September 10, 1993. (Tr. 137–41, 245–49). Dr. Horlick reported that Angelica's symptoms included wide swings in her blood sugar, although her blood glucose control was much improved. (Tr. 246). Dr. Horlick found no evidence of complications related to IDDM, and no organ involvement to date. (Tr. 139–41). A physical examination was normal and Dr. Horlick opined that Angelica could participate in all school activities, but that she needed to follow her meal and snack schedules. (Tr. 138, 245). Dr. Horlick reported that Angelica did not have a psychiatric disorder, although she struggled with her mother over her insulin injections. (Id.).

Angelica was also treated by Dr. Maria Mylene Abad, a pediatric endocrinologist at Mt. Sinai Medical Center, who completed a summary of her treatment on January 21, 1994. (Tr. 144–51). Dr. Abad noted that Angelica suffered from IDDM with high blood sugar, irritability, confusion, polyuria, and polydipsia; she also suffered from low blood sugar with weakness and dizziness. Dr. Abad also reported that Angelica occasionally had hypoglycemic episodes, especially before lunch, where Angelica would feel dizzy and weak. Angelica also occasionally suffered from hyperglycemia, with nocturia and polyuria. Dr. Abad instructed that Angelica's exercise and food intake needed to be balanced with her insulin. Dr. Abad found no behavior suggestive of a significant psychiatric disorder, and found Angelica to be cooperative, friendly, and verbose, and interested in being involved in her treatment. (Tr. 145, 149–151).

The record also contained numerous medical records from various hospitals and treating physicians. One such record from Mt. Sinai Hospital, dated December 1994 and used as an exhibit during the hearing, contains a chart from a diary for self-testing of blood sugar levels. (Tr. 169). According to the chart, Angelica's target blood sugar range was between 80 and 150 mg/dL. (Id.). Medical records reveal, however, that Angelica's levels were wide-ranging: a record from Mt. Sinai Medical Center dated July 27, 1994 noted levels ranging from 55 to 324; a record dated September 28, 1994 also revealed ranges of 65 to 286; and medical nursing progress notes dated October 31, 1994 documented lows in the 40s, although the levels increased after Angelica's insulin was changed. (Pl. Mem. Supp. J. at 10 (citing Tr. 294, 278, 252)). Self-testing diaries kept by Angelica's mother between December 1994 and February 1995 also document wide-ranging blood sugar levels, including levels in the 50s. (Id. at 11 (citing Tr. 169, 275–76)).

Angelica's mother also reported that Angelica needed constant blood monitoring, as she was too young to tell when she is hypoglycemic. Notes from New York Hospital indicate that the mother frequently accompanied Angelica to school to monitor her blood sugar and had taken an "indefinite leave of absence" from work to enable her to do so. (Tr. 125). In fact, a report prepared by Mt. Sinai's Child & Adolescent Psychiatry Outpatient Services, dated April 29, 1994, disclosed, "Mother volunteers in library at [patient's] school— to give finger sticks and monitor sugars (no school nurse)—[s]he had worked her way up as a bank administration until [patient was diagnosed with] DM and she took too much time off and was fired." (Tr. 345–51).

Dr. Rondon also examined Angelica again in March of 1994. He observed that she looked well and instructed her to continue the insulin regimen prescribed by Dr. Abad. (Tr. 254–55). In May of 1994, he reported that Angelica's diabetes had

been controlled by the insulin regimen. (Tr. 258–59). No problems were reported and a physical examination was unremarkable. Dr. Rondon also noted that Angelica's behavior had improved. (*Id.*).

On July 27, 1994, Dr. Abad again examined Angelica, and reported that she was "doing better" with her current treatment and that her IDDM was in "fair" control. (Tr. 294). She prescribed a long-acting insulin and nutrition counseling. (*Id.*). In January of 1995, Angelica's mother told Dr. Abad that Angelica's new diet was helping "a lot" and that her blood sugar was generally "in the 100s." (Tr. 277). On December 24, 1994, however, Angelica was taken to the emergency room again for ketones in her urine. (Pl. Mem. Supp. J. at 11 (citing Tr. 290–91)).

On September 15, 1995, Angelica suffered a hyphema, *i.e.*, anterior chamber hemorrhage, in her right eye, which required surgery. (Tr. 310–11, 336, 341). She was excused from strenuous activities as a result. (Tr. 310).

On February 23, 1996, Dr. Abad prepared a written evaluation of Angelica's condition:

> Despite extraordinary efforts on her mother's part, which includes checking her blood sugar at least 4 times a day and giving insulin injections 3 times a day, Angelica's diabetes control has only been fair with her hemoglobin Alc's ranging from 8.3 to 10.1%.[5] Her less than ideal control seems to be largely caused by a lot of psychosocial issues which inevitably affect her diabetes and which are presently being addressed by her psychiatrist. Several times a week, she wakes up with ketones without hyperglycemia. Her blood sugars are also

quite erratic with several highs and lows. Fortunately, her mother checks her blood sugars several times a day so that problems are picked up early and appropriate treatment is instituted, thus avoiding serious medical consequences or the need for hospitalization.

(Tr. 308).

On March 5, 1997, Angelica was again treated in the emergency room at Mt. Sinai for stomach pain and weakness. (Tr. 368–81). Urine tests revealed moderate ketones. Angelica was diagnosed with viral symptoms and diabetes mellitus and her mother was instructed to administer a dose of isophane insulin at 12 a.m. (Tr. 374–76). She was discharged the same day. (*Id.*).

### (b) *Psychiatric Impairments*

On April 20, 1994, psychiatrists from Mt. Sinai Child and Adolescent Psychiatry Outpatient Services prepared a report regarding Angelica's "violent outbursts," biting, screaming, and overall resistance to and non-compliance with her diabetes regimen. (Tr. 345–51). Angelica was evaluated over a two-month period, and responded well to therapy. (Tr. 331). She was described as a pleasant, cooperative child who communicated with clear and spontaneous speech. The examining psychiatrist also reported she was doing very well with academic performance and attendance. She also reportedly got along very well with her parents and her sister, and had good peer interactions at school and at home. Because of her IDDM, however, Angelica's eating habits were a problem. Angelica's Global Assessment of Functioning ("GAF") was rated at 80 (she had received a rating of 70 the past year),[6] and

---

**5.** Hemoglobin Alc is used to estimate glucose control in patients during the 1–3 month period preceding the test. A normal level is approximately 6%, but " 'in poorly controlled diabetics, the level ranges from 9 to 12%.' "

Pl. Mem. Supp. J. at 11 (citing The Merck Manual of Diagnostics and Therapy 171 (17th ed.)).

**6.** A GAF of 71–80 indicates that symptoms, if any, are transient and expected reactions to

she was diagnosed with parent-child problem and adjustment disorder. Because Angelica had shown improvement with therapy, she was to be monitored by a social worker at the Mt. Sinai Medical Center's Clinic. (Tr. 345–51).

In October of 1995, Angelica was referred to Dr. S. Kahn at Mt. Sinai Psychiatric Services, for treatment of anxiety attacks she suffered following her eye injury. (Tr. 336–44). Dr. Kahn performed a mental status examination, and found that Angelica's speech was coherent, that she was oriented to person, place, and time, and that she denied any hallucinations or delusions. Dr. Kahn also reported that Angelica had above average intelligence and that her thought processes were logical and her judgment was fair. Angelica's attendance record in school was above average and she performed "very well"; she was also socially appropriate with her schoolmates and got along with her mother and younger sister. Dr. Kahn diagnosed Angelica with acute adjustment disorder with anxiety and panic attack. Angelica's GAF was rated at 80. (*Id.*).

Angelica was also examined by Dr. David Deuser at Mt. Sinai Hospital in July of 1997, who continued to treat her for an extended course of therapy. In September of 1997, Dr. Deuser reported that Angelica carried diagnoses of generalized anxiety disorder with panic attacks and of oppositional defiant disorder with parent-child problem. He reported that Angelica required several hours each night to achieve sleep, waking frequently most nights with both night terrors and panic attacks. Dr. Deuser also noted that Angelica was anxious throughout most days, and had some residual anxiety and con-

flicts with her mother since her parents' separation. In addition, Dr. Deuser opined that Angelica's oppositional defiant disorder with parent-child problem also contributed to a decreased compliance with her insulin regimen and the treatment of her diabetes. (Tr. 331–32).

In an undated written psychiatric assessment, Dr. Deuser noted that Angelica was also seen at Mt. Sinai Psychiatric Services for individual therapy on a weekly basis. (Tr. 354). He reported that Angelica was well-groomed, pleasant, cooperative, and well-related. He noted that her mood was "depressed at times" but "nervous most of the time," with "isolative behaviors." Her affect was constricted to the depressed-and-anxious range with positive lability. Her cognition was age-appropriate, but he noted that her insight was "only fair" as she had "difficulty understanding her fears." Her judgment was good, with no evidence of risk-taking behaviors secondary to symptomatology. Dr. Deuser's diagnosis was generalized anxiety disorder and opposition defiance disorder, and a parent-child problem. Dr. Deuser assessed Angelica's GAF at 55. (Tr. 354–55).

Dr. Deuser also reported that although Angelica had responded well to medication with total remission of panic attacks, the medication also caused partial sedation, and there was concern about her ability to function properly in school. At the time, Angelica was experiencing panic attacks two to three times per month; her other symptoms of anxiety had diminished but were not relieved. Angelica had made fairly good progress in therapy and Dr. Deuser believed she was on the verge of

---

psycho-social stressors. Such a rating indicates no more than a slight impairment in social, occupational, or school functioning. A GAF of 61–70 indicates some mild symptoms or some difficulty in social, occupational or

school functioning, but that the individual is generally functioning pretty well, with some meaningful interpersonal relationships. (Pl. Mem. Supp. J. at 10).

several incremental improvements. His prognosis was fair; however, he reserved the option to try the medication again "if [Angelica is] unable to tolerate this new school year or if does not make the anticipated improvements." Finally, Dr. Deuser reported that Angelica's "impairment" had already lasted more than twelve months and he anticipated that it would continue to occur. Accordingly, he stated that he "would hesitate to label it chronic" at that time. (Tr. 354–55).

## 2. *Evidence Submitted After The ALJ's Decision*

After the ALJ issued its March 27, 1998 decision denying Morales's application for benefits, Morales submitted a memorandum and new evidence to the Appeals Council requesting review of the decision. (Tr. 5–23, 382–405). This new evidence consisted of letters from Dr. Vargas and Dr. Weisstuch, Angelica's school records from 1999–2000, and Angelica's self-testing blood sugar diary. Dr. Vargas's letter, dated October 5, 2000, explained that: Angelica had been under her care for the past two years; Angelica had been diagnosed with IDDM in April of 1993 and with hypothyroidism in February of 2000; Angelica had "been under fair to poor diabetes control"; her diabetes had been "very difficult to get under her control," especially during the past two years despite frequent visits with the doctor, nurse educator, and nutritionist; her last glycohemoglobin was 10.4% (normal range is 4–6%); Angelica had frequent and recurring low blood sugar requiring treatment with glucose tabs; she received Glucagon for a severe hypoglycemia on several occasions; she also had frequent hyperglycemia requiring coverage with Humalog injections; she frequently receives four to five insulin injections per day; and Dr. Vargas was

considering Angelica for an insulin pump. Dr. Vargas also stated that Angelica required monthly visits to the Diabetes Center, and that she must be accompanied by her mother. (Tr. 382).

In addition, the new evidence of self-testing blood sugar diaries revealed that Angelica's "target blood sugar" was still 80 to 150 mg/dL and that her doctor recommended that she test five times per day, seven days per week. (Tr. 391).

The Appeals Council considered the new evidence, but concluded nonetheless that the ALJ's decision was "supported by substantial evidence" and was "in accordance with the law and its implementing regulations." (Tr. 5).

## DISCUSSION

Morales moves for judgment on the pleadings, for an order reversing the final decision of the Commissioner and remanding the action solely for the calculation of benefits because the "record contains substantial evidence of disability and the delays in th[e] case have been unconscionable." In the alternative, Morales seeks a remand for a new hearing and decision. Morales challenges the Commissioner's decision on three grounds: (1) the ALJ failed to address the Commissioner's Listing for childhood diabetes; (2) the ALJ's decision was not supported by substantial evidence; and (3) the Appeals Council applied the incorrect standard to Morales's request for review. The Commissioner cross-moves for judgment on the pleadings, for an order affirming the Commissioner's decision and dismissing the complaint.

For the reasons set forth below, I conclude that the ALJ's March 27, 1998 decision was not supported by substantial evidence.[7] Accordingly, Morales's motion for

---

7. Because I conclude that Morales's motion should be granted based on her first two arguments, I need not address her third argument.

judgment on the pleadings is granted and the Commissioner's cross-motion is denied. The Commissioner's decision is reversed and the case is remanded solely for the calculation of benefits.

## A. Standard for Determining Disability for Children

### 1. Scope of Judicial Review

■ A final determination by the Commissioner must be affirmed if it is not the result of legal error and is based on "substantial evidence." *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999) (findings of the Commissioner as to any fact shall be conclusive if supported by substantial evidence); 42 U.S.C. § 405(g). Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Rosa,* 168 F.3d at 77 (quoting *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996)). " 'To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.' " *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999) (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (per curiam)). The reviewing court may not, however, second guess the Commissioner's decision " 'even if it might justifiably have reached a different result upon a *de novo* review.' " *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984)).

### 2. Requirements for Eligibility

The SSI program is a federal program providing benefits to needy, aged, blind or disabled individuals who meet the statuto-

ry requirements. 42 U.S.C. § 1381. The eligibility standards for children's disability benefits were amended in 1996 by the PRWORA, which became law on August 22, 1996. To qualify for disability benefits under the PRWORA, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).[8]

To determine whether a child is disabled, the ALJ engages in a three-step analysis. 20 C.F.R. § 416.924(a). First, the ALJ must consider whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). If the child is so engaged, he or she will not be awarded SSI benefits. *Id.* Second, the ALJ must consider whether the child has a severe impairment. 20 C.F.R. § 416.924(c). A severe impairment is an impairment that is more than a slight abnormality. *Id.* Third, if the impairment is severe, the ALJ must consider whether the impairment meets or is medically or functionally equal to a disability listed in the designated "Listing of Impairments." 20 C.F.R. § 416.924(c); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listing"). An impairment will only qualify as a disability under the PRWORA if it is severe and constitutes, or is medically or functionally equal to, a disability in the Listing. 20 C.F.R. § 416.924(d).

To determine whether an impairment is functionally equivalent to a disability in the Listing, the ALJ must consider whether the child's impairment: (1) results in "extreme limitation of one specific function ... [or] more than one specific function";

---

**8.** Effective January 2, 2001, the Commissioner published revised final rules for determining a child's disability. Nonetheless, this

Court applies the interim rules that were in effect at the time of the Commissioner's final decision, March 27, 1998.

(2) affects "broad areas of development or functioning" as a result of "extreme limitations in one area of functioning or marked limitations in two areas of functioning"; (3) consists of similar episodic impairments that "are not necessarily related to a single, specific function"; and (4) requires treatment spanning at least one year which itself "causes marked and severe functional limitations." 20 C.F.R. § 416.926a(b)(1)-(4). In determining the functional equivalence of the child's impairment to those in the Listing, the ALJ must assess the child's development or functioning in each of the following five areas: (1) cognitive/communicative; (2) motor; (3) social; (4) personal; and (5) concentration, persistence, or pace. 20 C.F.R. § 416.926a(c)(4); *see Perez v. Halter*, No. 00 Civ. 5828, 2002 WL 1750845, at *3 (S.D.N.Y. July 24, 2002).

## B. *Application*

Applying the above analysis, the ALJ concluded that Morales was " 'not disabled' within the meaning of the Social Security Act." (Tr. 34).

### 1. *The ALJ's March 27, 1998 Decision*

The ALJ identified the specific issue to be decided and set forth the applicable legal standard, *i.e.*, the three-step analysis set forth above. (Tr. 32). Applying the first step, the ALJ determined that the record did not reflect that Angelica had engaged in any significant gainful activity since the date of her application. Applying the second step, the ALJ determined that Angelica had an impairment considered to be "severe," within the meaning of the Social Security Act and Regulations: well-controlled insulin dependent diabetes mellitus with no complications. (Tr. 34). The ALJ found this impairment to be "severe" because it imposed more than a minimal or slight functional limitation on her activities. The ALJ also found Angelica's right eye status post injury to be a "non-

severe" impairment. (*Id.*). In addition, the ALJ concluded that Angelica's "subjective complaint of 'panic attacks' [wa]s not a bona fide medically determinable psychiatric impairment." The ALJ stated that Angelica had "superior functioning mentally" and that Angelica apparently controlled the timing of the alleged panic attacks. (*Id.*).

At step three, the ALJ summarily stated, "the undersigned concludes that the objective medical evidence concerning [Angelica]'s impairments lack [sic] clinical or laboratory findings which meet or medically equal in severity the clinical criteria of any impairment" in the Listing. (Tr. 35). The ALJ then moved on to the "functional equivalence" alternative phase of the step three analysis, evaluating Angelica's claims thereunder. Ultimately, the ALJ determined that Angelica's impairments, singly or in combination, did not cause an extreme limitation of one specific function or marked and severe functional limitations of a combination of functions equivalent to a listed impairment. (*Id.*).

### 2. *Review of The ALJ's March 27, 1998 Decision*

■ After a review of the record as a whole, I conclude that the ALJ's determination that Angelica is "not disabled" is not supported by substantial evidence and is the result of legal error. In particular, the ALJ failed to adequately address whether Angelica's impairment met or medically equaled an impairment in the Listing. In fact, because the ALJ found that Angelica suffered the "severe" impairment of insulin dependent diabetes mellitus, it is difficult to reconcile its failure to consider whether Angelica's impairment met Listing 109.08, entitled "Juvenile diabetes mellitus."

At step three, an ALJ is required to find that a child is disabled if she has a physical

or mental impairment lasting at least twelve months that is either listed in the Listing or is determined to medically equal an impairment in the Listing. Thus, reference to the Listing is necessary. Listing 109.08 reads:

Juvenile diabetes mellitus ... requiring parenteral [injected] insulin. And one of the following, despite prescribed therapy:

A.  Recent, recurrent hospitalizations with acidosis; or

B.  Recent, recurrent episodes of hypoglycemia; or

C.  Growth retardation ...; or

D.  Impaired renal function ....

20 C.F.R. Pt. 404, Subpt. P, App. 1.

Here, the ALJ did not mention, much less discuss, Listing 109.08. Rather, in a wholly conclusory manner, the ALJ merely determined, without any explanation, that the "objective medical evidence" lacked findings that met or were medically equal in severity to the criteria for any listed impairment.

■ In fact, the record demonstrates unequivocally that Angelica's impairment met Listing 109.08(B). Angelica had suffered from diabetes mellitus for many years. Her mother had been giving her insulin injections for many years. Angelica also had suffered recurrent hypoglycemic episodes, which were "recent" in relation to the period under review, July 1, 1993 to March 27, 1998. Dr. Abad, one of Angelica's treating physicians, reported on January 21, 1994 that Angelica "occasionally had hypoglycemic episodes." (Tr. 147). *See Aviles v. Bowen,* 715 F.Supp. 509, 514 (S.D.N.Y.1989) ("There is no reason to believe that 'occasional' hypoglycemia does not constitute 'recurrent' hypoglycemia."). Under the treating physician rule, an ALJ must give controlling weight to a treating physician's opinion provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Schaal v. Apfel,* 134 F.3d 496, 503 (2d Cir.1998); *Molina,* 2002 WL 377529, at *8. Dr. Abad was a "treating physician," as she treated Angelica from September of 1993 through at least February of 1996.

The record also included medical records (as well as self-testing diaries) that showed that Angelica's blood sugar levels were wildly erratic, and at times dangerously low: as low as 55 in July of 1994, 65 in September of 1994, in the 40s in October of 1994; and in the 50s between December of 1994 and February of 1995. (*See* Pl. Mem. Supp. J. at 11). In addition, in February of 1996, Dr. Abad again reported that Angelica's blood sugar levels were "quite erratic with several highs and lows." These readings provide further proof of Angelica's recent and recurrent hypoglycemia.

In concluding that Angelica's impairment neither met nor was functionally equivalent to a listed impairment, the ALJ failed to adequately discuss the significance of (1) Dr. Abad's opinion and (2) the glucose readings in this context. The Appeals Council did not discuss the significance of the new evidence or the other medical evidence in this context. Nor did the Appeals Council discuss the applicability of Listing 109.08. Hence, both the ALJ and the Appeals Council erred in failing to consider Listing 109.08. Moreover, the conclusion of the ALJ (affirmed by the Appeals Council) that Angelica's diabetes did not meet or medically equal a listed impairment is simply not supported by substantial evidence. The record contains no evidence to support the conclusion that the impairment did not meet Listing 109.08(B)—no doctor, treating or otherwise, concluded that Angelica did *not* suffer from hypoglycemia.

It is true, as the Commissioner argues, that at times Angelica's diabetes was significantly controlled. Indeed, there was a stretch in 1994 when Angelica seemed to be doing quite well. But Angelica's progress was in large part a result of her mother's vigilance. Indeed, her mother lost her job because of the time she had to miss from work. It is probably no coincidence that with the interruption in her mother's income and without the assistance of SSI benefits, Angelica's condition became worse in 1996 and thereafter.[9]

Finally, the new evidence submitted to the Appeals Council after the ALJ's decision is significant, as it confirms that Angelica's diabetes meets Listing 109.08(B). For example, on October 5, 2000, Dr. Vargas, another of Angelica's "treating physicians,"[10] reported that Angelica had received Glucagon for "severe hypoglycemia on several occasions." (Tr. 382). Dr. Vargas also stated that Angelica's diabetes has been "very difficult to get under her control," and indeed, from Dr. Vargas's letter, Angelica's condition appears to have deteriorated. (Id.).

█ Respondent argues that this new evidence "should not be considered" because, under 20 C.F.R. § 416.1470(b), the Appeals Council will consider new and material evidence "only where it relates to the period on or before the date of the [ALJ] hearing decision." This argument is misplaced. Here, the Appeals Council has already considered the new evidence, and made it a part of the record: "The Appeals Council has *also considered* the contentions that your representative made in the

letter dated October 5, 2000 and the additional evidence from Dr. Vargas, Dr. Weisstuch, your school records from 1999–2000 and your self-testing blood sugar diary. After considering the evidence of record, the Appeals Council concludes that the decision of the [ALJ] is supported by substantial evidence . . . ." (Tr. 5–7) (emphasis added). Accordingly, because the new evidence was considered by the Appeals Council and made a part of the record, the evidence is properly before this Court.

As to the evidence of psychiatric impairment, Morales does not claim that Angelica's "psychiatric impairments are themselves disabling." (Pl. Mem. Supp. J. at 17 n. 13). Rather, Morales contends that the evidence is important as it demonstrates the significant psychological effect IDDM had on Angelica. She also points out the adverse effect Angelica's anger, depression, and oppositional defiant disorder had, in turn, on Angelica's ability to accept and comply with her insulin regimen. Dr. Abad recognized this as well, remarking that "[d]espite extraordinary efforts on her mother's part . . . Angelica's diabetes control ha[d] only been fair." (Tr. 308). Dr. Abad opined that Angelica's poor control of her diabetes seemed to be "largely caused by a lot of psychosocial issues which inevitably affect her diabetes." (Id.). On the other hand, the ALJ rejected the evidence of Angelica's psychiatric impairment. It determined that Angelica's psychiatric impairments did not constitute a bona fide medical impairment because "[t]here is not a single objective sign of an anxiety disorder or any other psychi-

9. Morales correctly points out that the Social Security Administration does not seek to punish caretakers for ameliorating a child's impairment: "Children with serious impairments may spend much of their time in structured or highly supportive setting . . . . in which family members make extraordinary adjustments to accommodate [a child's] impairment . . . . Therefore, if your symptoms

or signs are controlled or reduced by the environment in which you live, we will consider your functioning outside of this highly structured setting." 20 C.F.R. § 416.924c(d).

10. Dr. Vargas initially treated Angelica in 1993 and again from 1998 to at least 2000. (Tr. 382).

atric disorder ... in the record." (Tr. 38–39). The ALJ also determined that Angelica has "superior functioning mentally and the timing of the alleged panic attacks apparently is controlled by the claimant." (Tr. 34).

The ALJ's primary focus appears to have been on Angelica's intelligence and scholastic success. As a consequence, however, the ALJ seemingly disregarded substantial evidence of psychiatric impairment from Dr. Deuser, Angelica's treating psychiatrist. For example, in 1997, Dr. Deuser diagnosed Angelica with generalized anxiety disorder with panic attacks and oppositional defiant disorder with parent-child problem, noting also that Angelica had trouble sleeping due to "night terrors" and "panic attacks." (Tr. 331–32). In addition, Dr. Deuser opined that Angelica's oppositional defiant disorder with parent-child problem also contributed to a decreased compliance with her insulin regimen and the treatment of her diabetes. (*Id.*). Angelica had also been treated by a Dr. S. Kahn in 1995, who diagnosed Angelica with acute adjustment disorder with anxiety and panic attack. (Tr. 336–44).

On the whole, although Angelica's doctors acknowledged Angelica's above average intelligence and appropriate social performance, such findings do not negate—or even materially detract from—the doctors' diagnoses of psychiatric impairment. Nor do Angelica's essentially normal mental status examinations, considering that the tests were administered by doctors who nevertheless rendered overall diagnoses of psychiatric impairment. Dr. Deuser's opinions were not inconsistent with other substantial evidence.

The ALJ should have considered the impact of the evidence of Angelica's psy-

chiatric difficulties on her IDDM. Instead of doing so, the ALJ concluded that Angelica's psychiatric impairments were not by themselves disabling. But this was not a position that Angelica had taken; indeed, she applied for disability benefits based on her diabetes rather than on any mental impairment. The psychiatric impairments were relevant to the issue of whether Angelica's diabetes was disabling.

I conclude that the ALJ's decision was not supported by substantial evidence and that the ALJ committed legal error by failing to consider Listing 109.08(B). Accordingly, the Commissioner's decision is reversed.[11]

## C. *Disposition*

The only issue outstanding, therefore, is whether this case should be remanded for further evidentiary proceedings or simply for a calculation of benefits. Morales argues that the case should be remanded solely for the calculation of benefits because the "record contains substantial evidence of disability and the delays in th[e] case have been unconscionable."

The Social Security Act is a "remedial statute, to be broadly construed and liberally applied." *Williams v. Bowen,* 859 F.2d 255, 260 (2d Cir.1988) (citation omitted). The Court may "order[ ] that benefits be paid when the record provides persuasive proof of disability" and to remand for further proceedings would therefore serve no purpose. *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980). In addition, while a court may consider delay, "a decision to reverse and direct an award for benefits 'should be made only when ... substantial evidence on the record as a whole indicates that the [c]laimant is dis-

---

**11.** Because I conclude that the ALJ committed legal error with respect to the "meets or medically equal[s]" phase of step three—and that the error was fatal to the ALJ's deci-

sion—I do not review the second phase of the ALJ's step three analysis or the remainder of its decision.

abled and entitled to benefits.'"' *Id.* (quoting *Gilliland v. Heckler,* 786 F.2d 178, 184 (3d Cir.1986)); *see also Molina v. Barnhart,* No. 00 Civ. 9522, 2002 WL 377529, at *8 (S.D.N.Y. Mar.11, 2002) (declining to remand where application of the correct legal standards could only lead to conclusion that plaintiff was disabled); *Straw v. Apfel,* No. 98 Civ. 5089, 2001 WL 406184, at *10 (S.D.N.Y. Apr.20, 2001) (declining to remand where plaintiff was entitled to benefits and there was no justification for further delay); *Curry v. Apfel,* 209 F.3d 117, 124 (2d Cir.2000) (declining to remand "given that [claimant's] application has been pending more than six years and that a remand . . . could result in substantial, additional delay"); *Balsamo v. Chater,* 142 F.3d 75, 82 (2d Cir.1998) ("'A remand, potentially followed by another appeal, could well delay the payment of benefits to which [the claimant] appears to be entitled for still further years.'") (quoting *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 644 (2d Cir.1983)).

 On review of the record as a whole, I conclude that Angelica is entitled to benefits under the Social Security Act, and a remand for further evidentiary proceedings would serve no purpose. Indeed, the new evidence submitted to the Appeals Council after the ALJ issued its decision confirms that Angelica suffers from juvenile diabetes mellitus as contemplated by Listing 109.08(B), and that she is entitled to benefits. Further, the nine-year administrative delay in this case is an additional reason to remand solely for the calculation of benefits. The purpose of providing SSI benefits to children is to assist them while they are children. *Molina,* 2002 WL 377529, at *10 (citing *Maldonado v. Apfel,* 55 F.Supp.2d 296, 307–08 (S.D.N.Y.1999)). Angelica was five years old when her mother first applied for benefits on her behalf; she is now approaching her fifteenth birthday. This case can tolerate no further delay.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion is denied; Morales's cross-motion for judgment on the pleadings is granted and the case is remanded solely for the calculation of benefits. The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.